**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

UNITED STATES OF AMERICA

v.                                                      CAUSE NO.: 1:14-CR-14-5-TLS-SLC

RICHARD A. COUNCIL

**OPINION AND ORDER**

This matter is before the Court on Defendant Richard A. Council's Motion to Amend

Where the Court Can Recharacterize Movant Motion for Reconsideration as a § 2255 Motion

[ECF No. 550], filed on March 19, 2020. The Defendant seeks to have his conviction and

sentence vacated under 28 U.S.C. § 2255, arguing ineffective assistance of counsel. For the

reasons set forth below, the Court DISMISSES the motion.

**BACKGROUND**

On May 4, 2017, the Defendant pled guilty [ECF No. 228] to Counts 1 and 2 of a six-

count Indictment [ECF No. 57]. Count 1 charged Conspiracy to Possess with Intent to Distribute

5 Kilograms or More of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and Count 2

charged Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18

U.S.C. § 924(c). *See* Indictment, ECF No. 57. In his plea agreement, the Defendant agreed that

the quantity of drugs involved in his offense of conviction, including relevant conduct, was at

least fifteen kilograms but less than fifty kilograms of cocaine. Plea Agreement ¶ 8(c)(iii), ECF

No. 220. During his plea hearing, the Defendant agreed with the following statement of facts

given by the Government. *See* Plea Hr'g Tr. 21:7–27:19, 27:20–25, ECF No. 416.

Starting in November of 2013, detectives with the Warsaw Police Department and agents

with ATF utilized a confidential informant (CI) to perform controlled buys of heroin from Floyd

Thomas Jr. (Thomas). Early in this investigation, Mr. Thomas brought up his interest in performing a robbery, asking if the CI had anyone that Mr. Thomas could "wipe down or stick up or something." In December 2013, the CI introduced an undercover task force officer (UC) to Mr. Thomas. The UC began purchasing heroin directly from Mr. Thomas, and the UC explained to Mr. Thomas that he had a contact who knew about a drug stash house for Mr. Thomas and his crew to rob through an armed home invasion. In January 2014, the UC introduced Mr. Thomas to this purported contact, who was an undercover ATF agent (UC2), and there were recorded initial discussions about the stash house robbery.

The UC had made arrangements with Mr. Thomas for Mr. Thomas and his robbery crew to meet with UC2 in a hotel room in Grant County, Indiana, on February 6, 2014. This meeting was audio and video recorded. Mr. Thomas arrived with his brother Derrick Thomas (D. Thomas), Richard Murray (Murray), and an unidentified male. During this meeting, UC2 briefed the group regarding the robbery target, and Mr. Thomas and his group asked questions about important details and discussed their plan for the robbery. UC2 explained that he had been delivering kilograms of cocaine periodically for a group of drug traffickers for the past several years, with these kilograms coming from a larger cocaine shipment at a stash house. UC2 said that the drug dealers change their location and that they call UC2 and provide directions to a location when they are ready for UC2 to get the cocaine for delivery. UC2 stated that his usual delivery of one to three kilograms is only part of the overall drug load and that he typically sees fifteen to twenty or so kilograms, or "keys," under the control of the drug dealers at the stash house. UC2 further explained that this was "powder" and "cocaine" and that there would not be any money or other drugs, with money kept in a separate location. As UC2 was explaining the circumstances of the location, Mr. Thomas and the other members of his group were asking

tactical questions and telling UC2 how they were going to conduct the armed drug robbery. Mr. Thomas and his crew said that they were ready and prepared for anything, including violence, and that they would bring the guns to do the job. They were planning to zip tie everyone and enter the house by acting like police officers.

Prior to February 12, 2014, the UC informed Mr. Thomas that UC2 would soon be called upon by the drug dealers to arrive at the stash house robbery target. On February 12, 2014, at approximately 2:30 p.m., Mr. Thomas and five other individuals arrived at a hotel in Allen County, Indiana, with these other individuals later identified as follows: Mr. D. Thomas, Mr. Murray, the Defendant, Prentice Bland (Bland), and Dwaine Bartlett (Bartlett). These six individuals met the UC and UC2 in the hotel parking lot, where they were provided with keys to hotel rooms. The group then met with the UC and UC2 in one of the rooms, with this meeting video and audio recorded.

Mr. Thomas told the UC and UC2 that he had a couple of new guys and that everyone was good. Mr. Thomas introduced Mr. Bland as the guy who drives around their "artillery," a reference to their firearms. UC2 provided the same information about the robbery target and said that the cocaine shipment would be ready later tonight or tomorrow morning. UC2 explained again that the residence would contain at least twenty kilograms, initially referencing the drugs as "keys," or kilograms, and later specifically saying that it was "powder cocaine" and "white." Mr. Bartlett said that they were going to sweep the house and make sure that no one was hiding anywhere, with the crew intending to place every occupant of the house in one room. Mr. Thomas stated that they were going to treat everyone as if they had guns. UC2 asked how they were going to secure the drug dealers and UC2 in the house during the robbery, and the Defendant said that they were going to zip tie UC2 just the like everyone else. UC2 asked if

3

anyone wanted to back out of the plan because this was the time to do so, and no one in Mr. Thomas' group made any statements about wanting out of the robbery plan, with Mr. Thomas saying that they were good on his end for whatever was necessary.

During both meetings, UC2 made it abundantly clear that the drug traffickers were not going to let twenty kilograms go, and that they were guarding the cocaine while armed. UC2 specifically asked the new participants, Mr. Bland, the Defendant, and Mr. Bartlett, if they were good, and each confirmed that they were. UC2 asked the Defendant his name, and the Defendant replied that his name was "Fats" and commented that they were good and that UC2 did not need to worry about anything. Based upon the discussion, the next step in the robbery plan was for Mr. Thomas and his crew to wait for UC2's call and then make final preparations at a Fort Wayne warehouse. They also discussed the split of the cocaine between UC2 and the robbery crew.

Later that same day, Mr. Thomas received a call from the undercovers, and at approximately 9:30 p.m., the UC and UC2 arrived at the hotel and met with Mr. Thomas and the others. The group departed for the warehouse. Mr. Thomas and Mr. D. Thomas rode in an undercover vehicle with the UC and UC2. Mr. Bland drove an aqua Nissan by himself. The Defendant drove a Kia, with Mr. Bartlett and Mr. Murray riding with him. The three vehicles arrived at the warehouse, and Mr. Bland pulled the Nissan into the building, with the events inside the building audio and video recorded. After entering the building, Mr. Thomas' crew gathered around the Nissan and made final preparations for the home invasion robbery. Mr. Thomas got into the front passenger area of the Nissan and then accessed the rear passenger area, putting an item on the trunk of the Nissan. As Mr. Thomas was doing this, the other five suspects were congregating around the trunk area of the Nissan. Mr. D. Thomas put on a body armor vest,

4

and Mr. Murray was already wearing a body armor vest. There were two additional body armor vests sitting on the trunk of the Nissan. As the undercovers walked away from the group, the arrest team deployed distraction devices, and officers secured the six suspects.

After the individuals were arrested, ATF special agents searched the Nissan, the Kia, and the suspects. On the trunk of the Nissan in plain view were two body armor vests and a loaded handgun, a Taurus model PT 24/7, .45 caliber. The video showed Mr. Bland removing the Taurus pistol from his waistband area and handing the pistol to Mr. Bartlett, who then placed it on the trunk of the Nissan. There were masks found within the items on the trunk of the Nissan, and other masks were found in the Kia. Large plastic zip ties were located on the floor near the Nissan, and Mr. Murray had additional zip ties in his jacket pocket. Within the items on the trunk of the Nissan were multiple articles of clothing and hats that were labeled with "POLICE," "NARCOTICS," and "SWAT." In the Nissan under the seats, agents located multiple additional firearms, including the following: a Mossberg shotgun, model 590, 12 gauge; a Smith and Wesson rifle, model MP15-22, .22 caliber; a Regent pistol, model R200S, .45 caliber; and a Beretta pistol, model 950BS, .25 caliber. All the firearms were loaded with a round in the chamber except the Smith and Wesson rifle; however, there were three 25-round magazines for this rifle, with two of them partially loaded with ammunition. All the firearms were later test fired, and each functioned as designed.

Based upon the recordings, the robbery crew members knew that the cocaine would be guarded by armed drug traffickers, and in order to steal the cocaine, the robbery crew would have to secure the armed guards by force or threat of force. Twenty kilograms of cocaine, and even just one kilogram of cocaine, is an amount far beyond a personal consumption amount and is indicative of an intent to distribute.

5

At the change of plea hearing, the Court asked the Defendant if he agreed or disagreed with this statement of facts from the Government, and the Defendant responded, "Yeah, I agree." *Id.* 27:20–27:25. During the hearing, the Defendant affirmatively stated that he "planned to rip off a drug house for their drugs" and that he "possessed a handgun to do so." Plea Hr'g Tr. 19:13–19:18. He further testified that the plan was "[t]o rob the drug house" and agreed that he possessed a gun on the date of the robbery and that the gun would help in robbing the drug house. *See* 20:15–20:23, 21–27.

On March 26, 2018, the Court sentenced the Defendant to 135 months of imprisonment on Count 1 and a consecutive 60 months of imprisonment on Count 2. *See* Sentencing, ECF No. 365. An Amended Judgment [ECF No. 367] was entered on March 30, 2018.

On February 19, 2019, the Defendant filed a Motion for Reduction of Sentence [ECF No. 455], citing 18 U.S.C. § 3582(c)(2) and *Hughes v. United States*, 138 S. Ct. 1765 (2018); the Court denied the motion on March 25, 2019, *see* ECF No. 461. On April 16, 2019, the Defendant filed a Motion for Reconsideration [ECF No. 472]. On February 18, 2020, the Court denied the Motion for Reconsideration as an impermissible successive § 3582(c)(2) motion but recognized that the Defendant also raised arguments that should be construed as a timely motion to vacate under 18 U.S.C. § 2255. *See* Feb. 18, 2020 Op. & Order, ECF 548. The Court gave the Defendant the necessary warnings related to the recharacterization of the arguments in the Motion for Reconsideration as a first § 2255 motion and granted the Defendant until March 20, 2020, to withdraw the motion or to refile the motion so that it contains all the § 2255 claims he believes he has. On March 19, 2020, the Defendant filed the instant motion pursuant to § 2255 [ECF No. 550]. The Government filed a response [ECF No. 563], and the Defendant filed a reply [ECF No. 567].

## ANALYSIS

Under 28 U.S.C. § 2255(a), a prisoner convicted of a federal crime may move the sentencing court to vacate, set aside, or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Motions to vacate a conviction or sentence ask the district court to grant an extraordinary remedy to one who already has had an opportunity for full process." *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006). Ineffective assistance of counsel claims may be raised under § 2255. *See Massaro v. United States*, 538 U.S. 500, 504 (2003).

Here, the Defendant argues that he was the victim of sentencing manipulation and sentencing entrapment, the drug quantity on which his sentence was based was inaccurate, his attorney failed to investigate the case, he was threatened by his counsel to accept the plea agreement, and his counsel failed to file a motion to suppress in relation to his possession of the gun. The Defendant contends that his attorney's failure to raise these issues prior to sentencing amounted to ineffective assistance of counsel. Counsel's assistance is constitutionally ineffective if it runs afoul of the standard established in *Strickland v. Washington* by (1) falling below an objective standard of reasonableness and (2) prejudicing the defendant such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. 668, 688, 692–94 (1984); *see also United States v. Graf*, 827 F.3d 581, 584 (7th Cir. 2016). The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and review of the attorney's actions is "highly deferential." *Strickland*, 466 U.S. at 689; *see Harris v. Reed*, 894

7

F.2d 871, 877 (7th Cir. 1990). If a defendant cannot establish one of the *Strickland* prongs, the Court need not consider the other. *See Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014). The Court considers each of the Defendant's arguments in turn.

1. *Sentencing Manipulation*

"Sentencing manipulation arises when the government engages in improper conduct that has the effect of increasing a defendant's sentence." *United States v. Garcia*, 79 F.3d 74, 75 (7th Cir. 1996) (citing *United States v. Cotts*, 14 F.3d 300, 306 n.2 (7th Cir. 1994)). The Defendant appears to argue that the Government fixed the quantity of drugs involved in the planned robbery at between fifteen and twenty kilograms of cocaine in order to increase his sentence. He also argues that the amount of cocaine used to calculate his sentence is inaccurate because it was "ghost dope." However, the Seventh Circuit Court of Appeals does not recognize the defense of sentencing manipulation. *See United States v. Blackman*, 830 F.3d 721, 727 (7th Cir. 2016) (citing *Garcia*, 79 F.3d at 76); *see also United States v. Turner*, 569 F.3d 637, 641 (7th Cir. 2009) (citing *Garcia*, 79 F.3d at 76). Thus, the Defendant's attorney could not be ineffective in failing to pursue an argument that is not valid. *See United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003) ("A defendant's lawyer has, it is certainly true, no duty to make a *frivolous* argument; and there is a tactical reason not to make weak arguments . . . ."), *overruled on other grounds by Lockhart v. United States*, 136 S. Ct. 958 (2016). Notably, in the Defendant's Sentencing Memorandum, the Defendant's attorney acknowledged the unavailability of the sentencing manipulation doctrine in this circuit, arguing instead for an application of the sentencing entrapment doctrine, as discussed below. *See* Def.'s Sentencing Mem. § E, ECF No. 356. The Defendant's motion fails on this issue.

2.      *Sentencing Entrapment and Drug Quantity*

Sentencing entrapment "occurs when the government causes a defendant initially predisposed to commit a lesser crime to commit a more serious offense." *Garcia*, 79 F.3d at 75. To succeed on a sentencing entrapment claim, a "defendant must show (1) that he lacked a predisposition to commit the crime, and (2) that his will was overcome by 'unrelenting government persistence.'" *Turner*, 569 F.3d at 641 (quoting *United States v. Gutierrez-Herrera*, 293 F.3d 373, 377 (7th Cir. 2002)). The facts do not support that the Defendant was subject to sentencing entrapment. Nevertheless, the Defendant's counsel made the argument in the Sentencing Memorandum and, thus, was not ineffective for failing to do so.

First, the Defendant asserts that, on the night of the planned robbery he was only a "driver" and that ATF agents induced "the young brothers from the hood" to "commit an offense that he was not otherwise predisposed to commit." Def.'s Mot. 2., ECF No. 550. The Defendant also states that he "and his brothers from hood" were trapped in a reverse sting by government agents to induce them to rob a government-controlled warehouse. *Id.* The Defendant does not identify any evidence in the record of this case, in the facts agreed to by the Defendant at the change of plea hearing, or in the arguments made in his motion to support any claim that he was not predisposed to commit a crime at all or that unrelenting government pressure caused him to commit a more serious offense than the crime he was originally predisposed to commit.

Instead, the evidence shows that the Defendant was present at the hotel on the afternoon of February 12, 2014, when the final preparations for the robbery were being made and the group discussed in detail how the robbery would be executed. *See* Plea Hr'g Tr. 23:12–18, 24:2–25:11. Each member of the crew had a job, and the Defendant's job was to drive himself and other members of the crew to the robbery location. *Id.* at 25:18–19. The Defendant admitted that he

9

had a gun with him that night to help with the robbery. *Id.* at 20:21–23. Also, when UC2 asked how the crew was going to secure the drug dealers and UC2 in the house during the robbery, the Defendant responded that they were going to zip tie UC2 just the like the drug dealers. *Id.* at 24:13–17. These facts point to the Defendant taking a more active role in the robbery than that of a mere driver; the evidence shows that he was part of some of the planning of the robbery. In addition, the Defendant had an opportunity to back out of the robbery once he knew all the details of the plan, including that the stash house typically had twenty kilograms of cocaine, and he declined to do so. *Id.* at 24:18–22.

Second, the Defendant argues that the quantity of drugs involved was only the five kilograms of cocaine that was charged in the Indictment and that the five kilograms should have been split eight ways among all the individuals involved, including the agents. Def.'s Mot. at 3. However, the Defendant was present in the hotel on the afternoon of the planned robbery when the crew was told the drug house typically has twenty kilograms of cocaine stored there. *See* Plea Hr'g Tr. 24:6–9. During the meeting, UC2 made it clear that the drug traffickers were not going to part willingly with twenty kilograms and that the drug traffickers guarding the cocaine would be armed. *Id.* at 24:23–25. UC2 specifically asked the new participants, including the Defendant, if they were "good," and each confirmed that he was. *Id.* at 25:1–6. The Defendant commented that they were good and that UC2 did not need to worry about anything. *Id.* The Defendant was brought in by Mr. Thomas to be part of a robbery "crew" whose plan was to rob the drug house of whatever drugs were inside; Mr. Thomas knew that between fifteen and twenty kilograms of cocaine were typically inside the drug house. There is no evidence or argument that there was ever a plan to steal only five kilograms of cocaine that was later increased to twenty kilograms

10

because of unrelenting government pressure. Thus, the facts do not support a defense of sentencing entrapment.

Moreover, the Defendant's attorney specifically raised sentencing entrapment in the Sentencing Memorandum, setting out the law and the relevant facts in detail. *See* Def.'s Sentencing Mem. § E. Describing the planned robbery as a reverse sting operation, counsel noted that, because the quantity of cocaine was at least 15 kilograms but less than 50 kilograms, the base offense level was 32 under United States Sentencing Guidelines § 2D1.1, and that, if the agent had said he thought there would be 14 kilograms or anything less than 15 kilograms of cocaine, then the base offense level would have been 30. Counsel then discussed the application notes to Guidelines § 2D1.1 and decisions in other circuits addressing government conduct that did not necessarily rise to the level of entrapment but that was sufficient to constitute "aggressive encouragement" to support a finding of imperfect entrapment and a reduction in the guideline calculation. Recognizing that the evidence of record does not support the Seventh Circuit's standard for a defense of sentencing entrapment, the Defendant's attorney nevertheless made an argument for an extension of the out-of-circuit decisions to the facts of this case. The Defendant does not acknowledge that his attorney raised the defense of sentencing entrapment and, thus, makes no assertion that the attorney's argument was deficient.

The Defendant has not identified facts that would support a sentencing entrapment defense and he cannot show that his attorney's conduct fell below an objective standard of reasonableness in relation to the sentencing entrapment argument. Nor can the Defendant show that the result of the proceedings would have been different had his attorney made a different argument. The Defendant's claim of ineffective assistance of counsel fails on this issue.

11

3.    *Drug Quantity*

The Defendant argues that he was sentenced based on a drug quantity that was not supported by the evidence and that was based on fabricated evidence and "ghost dope." Def.'s Mot. 5. However, the Defendant pled guilty to being part of a conspiracy, which has two elements: (1) an agreement to commit an unlawful act and (2) a defendant that knowingly and intentionally joined that agreement. *United States v. Cruse*, 805 F.3d 795, 811 (7th Cir. 2015) (citing *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006)). And, "[i]n a drug conspiracy, a defendant is responsible . . . for 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,'" which includes drug quantities. *United States v. Austin*, 806 F.3d 425, 430–31 (7th Cir. 2015) (quoting *United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2008)).

Here, the Defendant brought a gun to help with the robbery, he was present when final preparations were discussed on how the robbery would be committed, he was present in the hotel room when the undercover agent stated that the stash house would contain at least twenty kilograms of cocaine, he commented that they were "good" with the plan, and he declined to leave when offered the chance. *See* Plea Hr'g Tr. 19:16–18; 24:2–25:11. With these facts, the Defendant cannot argue that it was not reasonably foreseeable to him that that the drug quantity would be at least twenty kilograms of cocaine. And, the fact that the plan "involved a fictitious stash house and drugs does not prevent the Court from determining the quantity of drugs that were reasonably foreseeable as the object of the conspiracy." *United States v. Taylor*, No. 1:06-CR-23, 2013 WL 2470259, at *3 (N.D. Ind. June 7, 2013) (citing *United States v. McKenzie*, 656 F.3d 688, 691 (7th Cir. 2011) (noting that, while "the precise amount of drugs to be seized in the robbery" may not have been "a determining factor in each defendant's decision to join the

12

conspiracy, it is undeniable that all were under the impression that a vast quantity of drugs would be discovered at the fictitious stash house")).

Because the Defendant cannot show that the drug quantity of twenty kilograms of cocaine was not reasonably foreseeable to him, he cannot argue that the performance of his attorney fell below any objective standard of reasonableness by not contesting the drug quantity or that the result of the proceedings would have been different if he had. Again, the Defendant's assertion of ineffective assistance of counsel fails.

*4.   Reasonable Investigation*

The Defendant argues generally that he "requested his attorney to investigate this case and counsel refused to provide client with effective assistance of counsel." Def.'s Mot. 2, ECF No. 550; Def.'s Reply 4, ECF No. 567. "The Supreme Court has held that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Anderson v. United States*, 981 F.3d 565, 575 (7th Cir. 2020) (quoting *Strickland*, 466 U.S. at 691). However, the Defendant has not identified any aspect of the case that his attorney failed to reasonably investigate. *See Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003) (explaining that the petitioner "has the burden of providing the court sufficiently precise information, that is, 'a comprehensive showing as to what the investigation would have produced'" (quoting *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1133 (7th Cir. 1990))). Discovery in this case included the audio and video recordings of the January 27, 2014 meeting, the February 6, 2014 meeting, the February 12, 2014 meeting, and the warehouse on February 12, 2014, as well as photographs of the items possessed by the robbery crew in the warehouse on February 12, 2014. *See* Stipulation, ECF No. 302. Given the extensive discovery and the facts it showed, the Defendant has not met his burden of

showing what any additional investigation might have produced. The Defendant's assertion of ineffective assistance of counsel on this basis fails.

5.     *Threats to Accept the Plea Agreement*

The Defendant asserts that he was threatened by his counsel to enter into the plea agreement.[1] However, the Defendant's statements under oath at the change of plea hearing contradict this assertion, and a defendant's sworn statement during a Rule 11 plea colloquy are presumed to be true. *See United States v. Mays*, 593 F.3d 603, 607 (7th Cir. 2010). A defendant "cannot obtain relief [in relation to a guilty plea] by the expedient of contradicting statements freely made under oath, unless there is a compelling reason for the disparity." *Nunez v. United States*, 495 F.3d 544, 546 (7th Cir. 2007), *judgment vacated and remanded on other grounds*, 554 U.S. 911 (2008). When asked by the Court if "anyone threatened you in any way to persuade you to accept this agreement," the Defendant responded, "No." Plea Hr'g Tr. 8:17–8:19. A bit later, the Court asked the Defendant if "anyone attempted in any way to force you to plead guilty or otherwise threaten you?" and the Defendant answered, "No." *Id*. at 11:12–11:14. The Court also asked the Defendant, "Are you pleading guilty because it is your free will to do so?" to which the Defendant responded, "Yes." *Id.* at 11:15–11:17. And, when asked if he was fully satisfied with his attorney's representation of him and the advice given in this case, the Defendant answered, "Yes." *Id*. at 6:5–6:8. There is no indication in the record that the Defendant's attorney pressured him to take the plea agreement. Here, the Defendant's sworn

---

[1] In his reply brief, the Defendant asks for a departure under United States Sentencing Guidelines § 5K2.12 based on his contention that counsel threatened him to take the plea agreement. Def.'s Reply 5, ECF No. 567. However, § 5K2.12 is inapplicable because it addresses a defendant who "*committed the offense* because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense." U.S. Sentencing Guidelines Manual § 5K2.12 (U.S. Sentencing Comm'n 2018) (emphasis added). The Defendant does not argue that he was coerced or threated to participated in the robbery itself.

14

testimony is presumed to be true, and the Defendant has not shown a compelling reason for the contradictory statement in his motion.

6.    *Suppression of the Gun*

Finally, for the first time in the reply brief, the Defendant asserts that his attorney provided ineffective assistance by failing "to suppress the 'gun' [the Defendant] never possess[ed] during any of these events" where there was "actual innocence of the possession of a weapon." Def.'s Reply 4. Because the argument is raised for the first time in the reply brief, it is forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (recognizing that a "district court is entitled to find that an argument raised for the first time in a reply brief is forfeited"). Nevertheless, the argument would fail because, during the change of plea hearing, the Defendant agreed that he possessed a gun on the date of the robbery and that the gun he possessed would help in robbing the drug house. *See* Plea Hr'g Tr. 19:16–19:18, 20:15–20:23, 21–27. Again, in the absence of a compelling reason for the change in his position, the Defendant is bound by the representations he made under oath. *See Mays*, 593 F.3d at 607; *Nunez*, 495 F.3d at 546.

7.    *Evidentiary Hearing*

The Court concludes that there is no need for an evidentiary hearing. "An evidentiary hearing on a § 2255 motion is required unless the record 'conclusively show[s] that the prisoner is entitled to no relief.'" *Harden v. United States*, No. 20-1154, — F.3d —, —, 2021 WL 209140, at *5 (7th Cir. Jan. 21, 2021) (quoting 28 U.S.C. § 2255(b); citing *Kafo*, 467 F.3d at 1067). Thus, when a petitioner fails to support a 2255 motion with "a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions," no hearing is required. *Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002) (quoting *Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir. 1996)). Having

reviewed the allegations in his briefing [ECF Nos. 472, 550, 563], the Court concludes that the Defendant has not put forth "facts supporting each ground" of relief requested, which if proven true, would entitle the Defendant to relief requested as required in Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings for the United States District Courts. Therefore, the Court denies the Defendant's Motion to Vacate without an evidentiary hearing.

## NO CERTIFICATE OF APPEALABILITY

As this Order constitutes an adverse order to the applicant, the Court must address whether a certificate of appealability should be issued on this order. *See* Rule 11 of the Rules Governing Section 2255 Proceedings ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Rule 11 of the Rules Governing Section 2255 Proceedings. The substantial showing standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, 893 n.4 (1983)). Here, no reasonable jurist could conclude that the Court's assessment of the Sixth Amendment claims regarding counsel's assistance was debatable or wrong. Therefore, the Court will not issue a certificate of appealability as to this Order.

## CONCLUSION

Accordingly, the Court DISMISSES the Motion to Amend Where the Court Can Recharacterize Movant Motion for Reconsideration as a § 2255 Motion [ECF No. 550] and the Court DISMISSES the pending portion of the Motion for Reconsideration [ECF No. 472] that

was construed to be the Defendant's initial § 2255 arguments. Further, the Court DECLINES to issue a Certificate of Appealability.

       SO ORDERED on February 22, 2021.

                                     s/ Theresa L. Springmann
                                  JUDGE THERESA L. SPRINGMANN
                                  UNITED STATES DISTRICT COURT